## THOMAS BONNER v. THE STATE.

*No. 3562.   Decided November 29.*

1. **Arrest of Judgment — Indictment.**—It is not a valid objection to an indictment that a prior indictment for the same offense is pending against the defendant. The motion in arrest of judgment based upon this ground was properly overruled.

2. **Service of Indictment.—Arrest of Judgment** was moved upon the ground that no copy of the indictment was served upon the defendant. *Held,* that such objection comes too late if first made after verdict.

3. **Manslaughter—Charge of the Court.**—"Adequate Cause," as that phrase is used in article 593 of the Penal Code, means such cause as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. Any condition or circumstance which is capable of creating sudden passion sufficient to render the mind of a person of ordinary temper incapable of cool reflection may constitute "adequate cause," and where the evidence shows a number of conditions or circumstances tending either singly or collectively to constitute what a jury might consider adequate cause, the charge of the court should leave the jury at liberty to consider them all in determining whether or not adequate cause existed. The proof on this issue (for the substance of which see the opinion) clearly raised the question of manslaughter, and in failing to submit it to the jury the charge of the court was erroneous.

4. **Same — Practice. —** To be sufficient the charge of the court must instruct the jury fully upon all the issues arising upon the evidence in the case. The testimony of a defendant in his own behalf, in so far as the law of the case is concerned, is entitled to the same treatment as that of any other witness in the case. The mere fact that the defendant testified in his own behalf that he killed the deceased in self-defense will not deprive him of the right to have all other legitimate issues in the case submitted to the jury.

5. **Same—Self-Defense.**—Under the proof in this case the court erred in failing to instruct the jury that in judging of the defendant's acts in connection with his real or apprehended danger, they should judge of them from the defendant's standpoint and as they appeared to him at the time.

6. **Same.**—See the statement of the case for the charge of the court upon the issue of self-defense *held* erroneous and insufficient, because it presents the defendant's right of self-defense in a negative instead of an affirmative manner; because, although it presents the law applicable to the State's theory that the defendant provoked the fatal difficulty, it does not present the converse theory; and because, though demanded by the proof, it failed to present clearly the theory of an accidental or unintentional meeting.

7. **Same—Homicide in Defense of Another.**—A person acting on behalf of another, to prevent such other from sustaining serious bodily injury, is entitled to the same justification under the law as would be the person in whose behalf he acts. Upon this phase of the case the charge of the court (see the statement of the case) was obscure and insufficient.

8. **Same—Threats.**—The original charge of the court upon threats uttered by the

deceased was negative. The jury, requesting further instructions as to threats made by deceased several days prior to the homicide, asked the court, "Are they entitled to any consideration in rendering a verdict?" In response the court instructed the jury, in effect, that if the deceased commenced the difficulty, and was at the time of the killing "then doing some act or making some demonstration *to justify the belief* that he was then immediately about to carry such threats into execution," the defendant would be justified "*if need be*" in killing his assailant. *Held,* erroneous, the words "justify the belief" being more restrictive than the statutory words "manifested an intention to execute the threat;" and the words "if need be," as used, unnecessarily qualifying the defendant's rights under the law.

9. **Same—Practice.**—Especially in criminal trials is it improper for the trial court to place by frequent repetition too prominently before the jury any principle of law involved in the case. Such repetition may tend to create an impression upon the minds of the jury as to what may be the opinion of the court with regard to the facts to which the principle is applicable. Note the opinion that the charge of the court in this case is, with reference to one issue, obnoxious to this rule.

APPEAL from the Criminal District Court of Galveston. Tried below before Hon. C. L. Cleveland.

This conviction was in the second degree for the murder of Joe Sparks, and the penalty assessed by the verdict was a term of five years in the penitentiary.

By comparison with the record the brief of the counsel for the appellant, eliminating unimportant matter and avoiding repetition when practicable, is found to summarize the evidence sufficiently and correctly as follows:

James Simmons testified for the State that he saw the shooting of Joe Sparks by Thomas Bonner, which resulted in the death of the former. They were captains of rival base ball nines, and on the Sunday preceding the killing they had some words about the game. On that occasion Sparks rubbed his fist against Bonner's face, and Frank Nelson, defendant's cousin, threw a brick at Sparks, who then pursued Bonner and Nelson home. Sparks followed them to their gate and said, "You had better keep the black son-of-a-bitch penned up, for if I catch him out I will beat him up." Sparks stood about the gate and cursed and abused Bonner for some time. He was not as tall as Bonner, but was stouter, and could whip him in a fist fight. On the following Sunday Sparks saw Nelson near the same place and went towards him, when Nelson got up and went to his home, which was the fourth house from the corner where he had been sitting. Sparks followed. Bonner came out of the gate towards them, and as Nelson passed him he pulled out his pistol and pointed it at Sparks and said, "Stand back." Sparks, who was only a few feet from him, slapped or grabbed at the pistol. Defendant backed off from him, but he continued to advance upon defendant, and grabbed at his pistol as defendant retreated. Sparks missed his footing and fell, and as he was getting up defendant fired, the ball striking deceased in his neck. Sparks had nothing in his hands when he was going after Nelson nor when defendant drew his pistol and told

him to stand back, but he grabbed at it and kept on grabbing for it until he slipped and fell, and as he was getting up Bonner shot him.   Defendant said "stand back" two or three times before he shot, and had backed about ten feet before the shooting.   Sparks did not try to strike Bonner, and had no arms.   When shot he said, "You have shot your best friend; come and shake hands."

William Anderson testified for the State, in substance, as Simmons did, except that Bonner's sisters, on the first Sunday, kept Sparks from coming in the gate after their brother had got in; and that when he took after Nelson on the Sunday of the killing he said he wanted to give him a punching; that Sparks, the deceased, could whip two men like defendant; that there was nothing to prevent Bonner from shooting before he did if he had wanted to.

George Lemons, for the State, also testified substantially as Simmons did, except that while Bonner was retreating and Sparks advancing upon him Bonner snapped the pistol at him and it did not go off; also that Sparks said to Bonner's sister on the Sunday previous, "If you don't keep the black son-of-a-bitch penned up I'll kill him."

Jesse De Bruhl, for the State, testified substantially as the first witness did.

Sam Anderson, for the State, testified as Simmons did, except that Bonner snapped the pistol at Sparks as the latter grabbed at it, but it did not go off, and Sparks continued to grab at it.   "In the scuffle Joe Sparks fell down.   As he was in the act of getting up Thomas Bonner shot him in the neck.   *   *   *   Bonner backed off and Sparks advanced, grabbing for the pistol, some ten or fifteen feet before the shot was fired.   Bonner said two or three times 'Stand back' before shooting.   *   *   *   They were near together then, and Sparks slapped or grabbed at the pistol. Bonner hit his hands with the pistol once or twice."

Alphonse Max, for the State, testified substantially to the same facts as the preceding witnesses.

W. Williams's testimony for the State was substantially the same as that of former witnesses.   A part of it was as follows: "When Bonner drew the pistol he was on the sidewalk, but he backed off the sidewalk some ten or fifteen feet, saying, 'Stand back!' some two or three times before he shot.   Sparks continued to advance.   He was much stronger than Bonner, and could easily have whipped him in a fist fight.   On the previous Sunday he had struck Bonner in the face with his fist, and when Bonner ran into his house he cursed and threatened him, but Bonner's sister kept him from entering the gate."

Richard Nelson, for the State, testified that he did not see but heard the shooting; that Bonner was a quiet and inoffensive boy, eighteen or nineteen years old.   He was not strong, and had consumption; that Sparks

was powerful and aggressive, and had the reputation of being a danger-
ous man.

Joe Manion, for the defense, testified that he saw the first difficulty be-
tween Sparks and Bonner on the Sunday before Sparks was killed. Sparks
struck Bonner two licks with his fist, when Bonner ran for his home near
by. Sparks ran after him and Nelson to the gate of the yard where they
live. They seemed badly frightened. Sparks tried to get into the gate,
but was kept back by Bonner's sisters. Sparks cursed and threatened
Bonner, as stated by the other witnesses, and stayed there fifteen or twenty
minutes, creating a disturbance. Sparks was violent and dangerous, al-
ways ready for a fight, and bore that reputation. He would carry out any
threat he made. He was a powerful man, and Bonner would not have
been near his equal in a physical contest. This witness thus describes the
shooting: "I heard Tom Bonner say, 'Stand back!' I was about forty
feet away. Bonner was backing, and had the pistol pointed at Sparks,
and Sparks had his hand raised and was advancing on him when Bonner
shot. Sparks fell, and some boys carried him to the sidewalk. I did
not see Sparks and Bonner when they first met. They were in the street
when I first saw them. Tom Bonner seemed frightened when he was
backing from Sparks."

Henry Martin, for defense, testified to the superior strength of Sparks,
his character for violence, and that he might reasonably be expected to
carry out any threat he would make. That Thomas Bonner was a quiet,
peaceable, and inoffensive boy.

Mollie Raddo, for defense, testified that she was the sister of the de-
fendant; that on the Sunday before the killing she saw Tom Bonner and
Frank Nelson running towards their home pursued by Joe Sparks with a
brickbat in his hand. They ran into the yard, and witness and her sister
had to hold the gate against Sparks to keep him from coming in. "We
asked him to go away. He did not do so. He said, 'If you don't keep
that black bastard son-of-a-bitch penned up he is my meat.'"

Mrs. Ada Nelson, for defense, testified that she was a sister of defend-
ant. Her testimony was in substance the same as that of Mrs. Raddo,
except that she stated that Sparks undertook to force his way in the first
Sunday; threatened to kill defendant, and hung around the premises and
in the alley a good while watching for him; that he was a dangerous char-
acter, and would carry out any threat he would make. To the last two
statements William Howard and G. Ekeland and other witnesses also tes-
tified. Mrs. Nelson produced a black handled knife which she received
from some little girls in the neighborhood.

The defendant, testifying in his own behalf, identified the said knife
as the knife that Sparks had open in his hand when advancing on him
and when shot. He also related the assault made upon him by Sparks
the previous Sunday and the threats to kill him, and stated that on his

way home one night of the week before the killing Sparks took after him and he ran through the alley and got away; that he was going to his sister's when he saw Frank Nelson coming toward him pursued by Sparks; that Nelson got in the gate, when Sparks saw defendant and said, " You black son-of-a-bitch, you will do just as well," and made for him. Witness was greatly frightened at this third attack. He then testified as follows:

" I told him to stand back. He did not do so. I drew my pistol and told him to stand back again; he advanced on me rapidly and I retreated into the middle of the street; he kept rushing on me until I got out to the Susie car track and then back again toward the sidewalk, when Joe Sparks made a rush at me again, at the same time grabbing at my pistol, when he slipped and fell about half down. As he arose and was making a motion to come at me I again told him to stop. He did not do it, and I fired. I did not take any aim, I was so badly frightened when I shot. I wanted to stop him. When I saw I had stopped him I did not shoot any more." He also testified that deceased was a desperate and dangerous man, and that he believed that if deceased got to him he would have killed him, as he had threatened to do; that when asked by Sparks to shake hands he stepped up to do so, when Sparks tried to seize the pistol.

William Sparks, for the State, testified that the knife shown in court was not Joe Sparks's knife, and several witnesses stated that they saw nothing in Sparks's hand when he was shot. Almost all the witnesses testified that the deceased was violent and dangerous, and that defendant was much inferior to him in strength; was consumptive, and of a quiet and peaceable disposition.

Fred Klausen, for defense, testified to both occurrences, and, in substance, showed unprovoked attacks on defendant by deceased; the defendant's efforts to retreat and escape from Sparks, and his alarm and fright on such occasions.

The charge of the court referred to in head notes 6, 7, and 8 reads as follows:

   *    *    *    *    *    *    *    *    *    *    *    *

" If the jury believe from the evidence that the defendant was on the occasion of the homicide first assailed by the deceased without fault on the part of the defendant, in such manner, considering the relative size, strength, conditions, and circumstances of the parties, to cause him reasonable apprehension of immediate danger of death or serious bodily harm to himself (nor would he in such case be bound to retreat), and that he acted on this apprehension in defense of himself against his assailant, he would not be guilty of any offense. Threats against one do not justify one in killing the person who threatens him unless such person is doing some act or making some demonstration to justify the belief that he is then immediately about to carry such threats into execution. If the jury

believe from the evidence that the deceased, Joe Sparks, without weapons or weapon, was pursuing or seeking a quarrel with Frank Nelson, or to fight him with his fists, the defendant would have no right to interfere under such circumstances by using a deadly weapon to prevent any such pursuit or apprehended or threatened attack, if such there was, by the deceased upon or after the said Frank Nelson. In such case he would be only authorized in law to use such force only as might reasonably be sufficient to protect the said Nelson from such apprehended assault, but would not justify the use of a deadly weapon upon the deceased to effect that purpose. An assault without a weapon of any kind by a quarrelsome and violent man upon the person of another, when there is no reason for the belief of the person attacked or by another who interferes in his behalf that such person so assaulted was in danger of death or serious bodily harm, but that an ordinary battery was all that was intended and all that he had reason to fear from the assailant, neither the party assaulted nor any one interfering therein would have the right in law to take the life of such assailant. While one may repel a threatened assault upon himself or upon another in whose behalf he acts, and to that end may use force enough to repel it, yet he must not exceed this right; he may not use a deadly weapon in a deadly manner in repelling an assault or a threatened assault with the fists. The right of self-defense does not imply the right of attack, nor would it permit of acts done in retaliation or revenge. Therefore, if the jury should believe and find from the evidence that the defendant sought or brought on or voluntarily entered into a difficulty with the deceased for the purpose of wreaking vengeance upon him; or if you shall find and believe from the evidence that the defendant shot the deceased at a time when he had, because of the acts of the deceased, no reasonable apprehension of immediate and impending danger to himself of serious bodily injury, and did so from a spirit of retaliation or revenge for the purpose of punishing the deceased for past injuries done him, then the defendant can not avail himself of the law of self-defense, and you should not acquit on that ground."

*John Lovejoy* and *J. B. & C. J. Stubbs*, for appellant.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.— This appeal is from a judgment of conviction for murder of the second degree, the punishment being assessed at five years in the penitentiary.

1. Defendant made a motion in arrest of judgment upon the ground that he had not been served with a copy of the indictment upon which he had been tried, and because the said indictment was the second indictment preferred against him in this case, and was invalid because not sub-

stituted as provided by article 434 of the Code of Criminal Procedure, which prescribes the rule where a previous indictment has been lost or mislaid. Beyond the recitals in the motions in arrest and for new trial, we find no evidence in the record establishing the fact that the indictment was a second one found against appellant, and that the first had been lost or mislaid. If it was a second indictment this could avail the defendant nothing, because the pendency of one indictment is no bar to another, even for the same offense, though the accused can only be tried upon one. Hardin v. The State, 4 Texas Ct. App., 355; Cock v. The State, 8 Texas Ct. App., 659; Schindler v. The State, 15 Texas Ct. App., 394; Williams v. The State, 20 Texas Ct. App., 357. After verdict it is too late to object for the first time that no copy of the indictment was served on the defendant. Roberts v. The State, 5 Texas Ct. App., 141; Richardson v. The State, 7 Texas Ct. App., 486. No material error is shown in the court overruling the motion in arrest of judgment.

2. Numerous objections are urged to the charge of the court, both for errors of omission and commission. Its sufficiency is attacked by defendant's first bill of exceptions because it omitted to submit as part of the law of the case the issue of manslaughter, which issue, it is insisted, is clearly raised by the evidence. It is insisted by the Assistant Attorney-General in his brief that manslaughter is not in the case, because the defendant, in testifying as a witness, testified that he killed deceased in self-defense against apparent, if not real, danger—the deceased at the time he was killed being in the act of advancing upon him in a threatening manner, with a drawn knife in his hand—and that he shot deceased because he believed that if deceased had got to him he would have killed him, as he had threatened to do.

Independently of defendant's statement that he killed the deceased in self-defense, we think the evidence fairly raises the issue of manslaughter. Defendant and Nelson, his relative and friend, had previously been attacked by the deceased, who was a much more powerful man than either of them. Deceased had run both of them on the Sunday previous, and had chased them to their own home and to the inside of their own yard, and was only prevented from pursuing them into their own house by some female relatives of theirs. When the women asked him to go away he said "If you don't keep that black bastard son-of-a-bitch penned up he is my meat." He lurked around in a back alley to their premises, seeking an opportunity to get at them. A few nights before the killing he saw defendant on his way home, and again chased defendant through an alley. On the day of the homicide he was again chasing Nelson from the base ball ground, and had run him almost to the yard gate of his home when defendant met them. Nelson got in the gate, and Sparks, the deceased, seeing defendant, said to him, "You black son-of-a-bitch, you will do just as well," and immediately rushed upon him. Defendant

drew his pistol and retreated to the middle of the street, telling him repeatedly to "stand back." Sparks still advanced, grabbing at his pistol, when defendant finally fired the fatal shot. Most of the witnesses testified that deceased was a violent, dangerous man; that defendant was much inferior to him in strength, and was of a quiet, peaceable disposition, and was a consumptive. Some of the witnesses say Bonner seemed frightened when he was backing from Sparks. Bonner himself testified: "I told him to stop; he did not do it, and I fired. I did not take any aim particularly—I was so badly frightened when I shot. I wanted to stop him, and when I saw that I had stopped him I did not shoot any more."

By the expression "adequate cause," as used in the definition of manslaughter in our Code (Penal Code, art. 593), "is meant such as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection." Penal Code, art. 595.

It was, we think, a pertinent question to be determined by the jury from all the circumstances attendant upon the killing, whether the causes we have detailed were such as would commonly produce such a degree of anger, rage, resentment, or terror as to render the defendant's mind incapable of cool reflection. "Any condition or circumstance which is capable of creating sudden passion sufficient to render the mind of a person of ordinary temper incapable of cool reflection may constitute 'adequate cause,' and where the evidence shows a number of conditions or circumstances, tending either singly or collectively to constitute what a jury might consider adequate cause, the charge should leave the jury at liberty to consider them all in determining whether or not adequate cause existed." Orman v. The State, 24 Texas Ct. App., 495; Hawthorne v. The State, 28 Texas Ct. App., 212; Cochran v. The State, 28 Texas Ct. App., 422; Willson's Crim. Stats., sec. 1018.

The fact that the defendant, when testifying as a witness, claimed that he killed deceased in self-defense alone would not deprive him of the right to have all the other legitimate issues in the case submitted to the jury. In so far as the law of the case is concerned, his testimony is treated simply as that of any other witness in the case. The charge, to be sufficient, must submit all the legitimate issues fairly arising from all the evidence in the case. *Apropos* to the facts in this case, we quote the following from Rutherford's case, 15 Texas Court of Appeals, 236: "Here the defendant had been grossly insulted and abused by the language of the deceased, and these insults and abuse were being continued, and deceased was in the act apparently of preparing to make (making in this case) a deadly assault upon defendant with a knife; and besides this, the deceased was a notoriously desperate man. Such being the facts, we think it very natural that a person of ordinary temper would be aroused to a degree of sudden passion sufficient to render his mind incapable of cool reflection. It

would require, we think, a man of extraordinary coolness and bravery to remain free from sudden and violent passion, and to refrain from prompt and violent action under such circumstances. While such a state of facts may not constitute justifiable homicide, still we think they would well warrant a jury in finding that they did not constitute murder, and therefore the issue of manslaughter should have been submitted in the charge." See also 35 Mich., 16.

Several objections are urged to the charge of the court upon self-defense. There was no instruction that in judging of the defendant's acts in connection with his real or apprehended danger the jury should judge of them from his, defendant's, standpoint, and as they appeared to him at the time. Such an instruction was called for by the facts and circumstances developed in evidence. Bell v. The State, 20 Texas, 445; Cochran v. The State, 28 Texas Ct. App., 422, and authorities cited; Gonzales v. The State, 28 Texas Ct. App., 130.

We are of opinion that the charge of the court upon this branch of the case is obnoxious to the further objection that it presents defendant's right of self-defense in a negative instead of affirmative manner. It is also defective in that, whilst it presents the law upon the theory of defendant's provoking the difficulty, it does not present the converse theory, nor plainly the theory of an accidental and unintentional meeting. Defendant had just emerged from his house when he came upon the deceased in hot pursuit of Nelson. It is not shown that he had seen the parties before he left the house, or that he went out for the purpose of engaging in or provoking a difficulty with deceased. For aught that appears he may have been entirely innocent of any such intention, and the meeting a purely accidental one. If it was accidental, and the deceased attacked him without his having done anything to provoke such attack, his right of self-defense would be perfect; and if deceased so attacked him as to create in his mind a reasonable apprehension of death or serious bodily harm he would be fully justified in taking his life. Bonnard v. The State, 25 Texas Ct. App., 173; Meuly v. The State, 26 Texas Ct. App., 274; Varnell v. The State, 26 Texas Ct. App., 56.

Again, "a person acting on behalf of another, to prevent such other from sustaining serious bodily injury, is entitled to the same justification under the law as would be the person in whose behalf he acts." Willson's Crim. Stats., sec. 980. If, then, the deceased was pursuing Nelson with a knife with intent to inflict serious bodily injury or death upon Nelson, and in order to protect Nelson from such injury the defendant shot and killed the deceased, he would in such event be justifiable to the same extent that Nelson would have been had he fired the fatal shot. This phase of the law was not clearly and sufficiently presented by the charge.

In response to a request from the jury for additional instructions upon the law relative to previous threats by deceased towards the defendant,

the court submitted additional instructions which are also complained of. We are of opinion that these instructions are objectionable in that they also present the law negatively and not affirmatively for the defense. Irvine v. The State, 20 Texas Ct. App., 12.

The original charge substantially instructed the jury negatively on the law of threats as contained in article 608 of the Penal Code. The jury requested further instructions as to threats made by deceased several days before the homicide, and asked, "Are they entitled to any consideration in rendering a verdict?" In response the court told the jury, in effect, that if deceased commenced the difficulty, and was at the time of the killing "then doing some act or making some demonstration *to justify the belief* that he was then immediately about to carry such threats into execution," the defendant would be justified "*if need be*" in killing his assailant. The words "justify the belief" are more restrictive than the statutory words "manifested an intention to execute the threat." If a man's acts "justify the belief" that he is about to take life or do serious bodily harm, the party thus assailed would have the right to kill in self-defense whether the assailant had made any threats or not against him. It is only required by the statute that the assailant should manifest an intention to execute his threats in order to afford a justification for taking his life. It seems to us also that the words "if need be," as used by the learned judge, unnecessarily qualify defendant's rights under the statute.

In the second paragraph of the instructions the learned judge reiterates the law as to defendant provoking the difficulty, and tells the jury that if he did so he can not justify on the ground of threats. This instruction was not responsive to the question of the jury, was unnecessary, and was objectionable in that it was calculated to place too prominently before the jury this feature of the case. "It is undoubtedly improper for a court to place by frequent repetitions too prominently before a jury any principle of law involved in the case. Traylor v. Townsend, 61 Texas, 144; Powell v. Messer, 18 Texas, 401. And especially is such a rule important in a criminal case, in order to guard against creating an impression upon the minds of the jury as to what may be the opinion of the court with regard to the facts to which the principle is applicable." Irvine v. The State, 20 Texas Ct. App., 12.

Other matters are complained of and assigned for error which we will not discuss, inasmuch as they are not likely to arise upon another trial.

For the errors we have pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Hurt, J., absent.