## SAM B. McKASKLE v. THE STATE.

### No. 8301.    Decided March 12, 1924.

**1.—Murder—Adequate Cause—Manslaughter—Charge of Court.**

Where, upon trial of murder and a conviction for that offense, the court instructed among other things on self-defense but refused to submit charge on manslaughter, although the evidence raised the issue of adequate cause and that the defendant was probably incapable of cool reflection, the judgment must be reversed and the cause remanded. Following Steen v. State, 88 Texas Crim. Rep., 256, 225 S. W. Rep., 529.

**2.—Same—Manslaughter—Charge of Court.**

The jury might or might not find that the shooting in the instant case was under the immediate influence of sudden passion, but in the opinion of this court the decision of that question was for the jury and not for the trial court and its refusal to submit a charge on manslaughter was reversible error. Following Pickens v. State, 218 S. W. Rep., 758.

**3.—Same—Charge of Court—Practice in Trial Court.**

After the trial court prepared his charge and submitted same to counsel for defendant who thereupon presented a number of exceptions to same and also special charges, and it appeared from the bill of exceptions that the court after considering said exceptions and requested charges changed his main charge and thereafter refused to submit it to counsel for appellant for further exception, unless they themselves would agree to draw a complete charge either on self-defense or threats, and finally refused the same for further exception, this, under article 737a C. C. P., is reversible error.

**4.—Same—Motion for New Trial—Exceptions to Charge.**

The contention by the State that the defense can set up in a motion for new trial all matters of legitimate exception to the charge, etc., is untenable; the law as amended requires that the trial court submit his charge to the attorney for the defendant before same is read to the jury, and makes it the duty of such attorney to then take all exceptions to the charge, and after these exceptions have been considered the trial court may correct or change his charge but must then submit it again to defendant's attorney for further exception. Following Czernicki v. State, 85 Texas Crim. Rep., 169, 211 S. W. Rep., 223

Appeal from the Criminal District Court of Harris. Tried below before the Honorable C. W. Robinson.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*E. T. Branch*, and *Mathis, Heidingsfelder, Teague & Kahn*, for appellant. On question of submitting charge to attorney: Harris v. State, 76 Texas Crim. Rep., 126; Goode v. State, 75 id., 550; Abrigo v. State, 77 id., 285.

On question of manslaughter: Swain v. State, 48 Texas Crim. Rep., 98; Pickens v. State, 218 S. W. Rep., 755; Lewis v. State, 231 id., 113; Theriot v. State, 231 id., 777; White v. State, 225 id., 511, and cases cited in opinion.

*Tom Garrard* and *Grover C. Morris*, Assistants Attorney General, and *J. Dixie Smith*, District Attorney, for the state.—On question of manslaughter: Summers v. State, 148 S. W. Rep., 774; Blount v. State, 126 id., 570; Ford v. State, 50 id., 350; Jennings v. State, 132 id., 473.

LATTIMORE, JUDGE.—Appellant was convicted in the Criminal District Court of Harris County of murder, and his punishment fixed at twenty-five years in the penitentiary.

We discuss but two questions. The killing was at night near one of the most public street corners in the city of Houston. Appellant's wife was employed in the Union National Bank building and got off work about nine P. M. It was his custom to come down for her a little before that time. On this night his car was parked on Congress Street near the rear of the bank building and he was sitting in the car, having also in there a shotgun loaded with buckshot. According to appellant's theory deceased appeared on the sidewalk and accosted him and made threatening gestures because of which and previous matters between them appellant said he was under the belief that his life was about to be taken and he shot. State witnesses locate deceased at some distance from appellant's car when the two first shots were fired, and one says that deceased was standing with his arms ap-

parently folded facing away from said car at a distance of about one hundred feet when the first shot was fired. Wounds on the body of deceased indicated close proximity of the parties. No motive is indicated by the State's testimony. For the defense it was shown that appellant was a small man weighing 135 pounds, fifty-seven years old and not in the habit of having fights, while deceased was a man weighing 200 pounds, about thirty-five years old and was in fact and reputation a bad man, had killed one man in Galveston, shot another in Brookshire, and had fought vigorously and successfully on many other occasions. It was shown that he had become enraged at appellant and had made many and serious threats against him, the last communicated threat having been made the day before the homicide to witness Harrington, who stated that he met deceased in the vicinity of the Union National Bank building and the latter asked him if he had seen Sam (appellant) and said:

"Well, I have been looking for him and trying to find him. I left word for him to meet me on several occasion and he hasn't done it, and when I do see the son-of-a-bitch I am going to fix him."

Witness testified that he told appellant that night what deceased had said. Another witness testified that she overheard deceased say to appellant over a telephone:

"You God-damned-son-of-a-bitch, if you don't pay me I am going to kill you the first time I see you on the street, any place, anywhere, any time, the first time I see you."

A number of witnesses swore that deceased's reputation was that of a dangerous and violent man and one who would carry out a threat seriously made. Appellant and his wife both said that a short time before the homicide they saw deceased coming away from their home in a car and when they got inside they found a note addressed to appellant of a threatening character. Appellant also testified to a long continued course of conduct on the part of deceased, whose character he stated was known to him, by means of which he was terrorized, compelled to pay deceased money that he did not owe him, and to let him have his car till it was almost ruined and he could stand it no longer. That deceased was constantly cursing and abusing him until he had to ask him to move away from his house where deceased had been boarding, and that on that occasion and many others deceased threatened to kill him, etc., etc. He said that knowing the reputation of deceased and fearing an attack from him, on the day of the homicide he went to a pawnshop and redeemed his shotgun and bought some buckshot shells with which to protect himself if occasion demanded. Appellant said that deceased knew his custom of meeting his wife at night at the bank building and that in order to prevent discovery and annoyance at the hands of deceased he changed his parking place. That on the night in question he was parked near the

rear of the bank building and was sitting in his car waiting for his wife when he saw deceased coming straight toward him and near to his car and the deceased then said: "You son-of-a-bitch ,you are hiding from me," and made movements with his hands and body that caused appellant to think that deceased was going to attack him and kill him and that he raised his shotgun and began firing. He said when he fired deceased wheeled and ran and that he continued firing until deceased fell. He said that he was afraid of deceased, that he was excited at the time and shot because of the threats formerly made by deceased, and that the latter was coming at him and he thought was going to kill him.

He who kills another under the immediate influence of sudden passion arising from an adequate cause, is guilty only of manslaughter. The passion meant is anger, rage, terror, etc., rendering the mind of the slayer incapable of cool reflection, for which passion there must ordinarily be adequate cause occurring at the time of the homicide, though such cause then arising may not be the sole cause. To be adequate cause to arouse such passion there must appear circumstances which would commonly produce that degree of anger, rage, etc., in the mind of a person of ordinary temper as would render it incapable of cool reflection. What these circumstances may be must necessarily vary with each case, but when they appear in evidence, their sufficience becomes a question for the jury, and when the court is in doubt as to the existence of such circumstances, that doubt should be resolved in favor of the giving of a charge on manslaughter. What caused this killing? The State attempts no answer but relies on the facts surrounding the shooting. The defense puts before the jury the character of the deceased, his increasing evil treatment of appellant, the fear of the latter for deceased, the disparity in their age and physical strength, the abuse of appellant by deceased culminating in serious threats to take his life or do him bodily harm, the finding of the note on the table, the arming of appellant to protect himself, his apparent hiding by changing the parking place of his car, etc. It was shown that on the night of the homicide appellant proceeded to. where his duty to his wife ordinarily called him, and that he was sitting in his car apparently waiting for her when deceased came along and the shooting occurred.

Appellant gave his version of the affair, asserting fear, excitement and that he shot in self-defense. The learned trial judge seems to have concluded that appellant having claimed that he killed in self-defense, this was all that need be submitted as the defensive theory. In Steen v. State, 88 Texas Crim. Rep., 256, 225 S. W. Rep., 529, we said in substance that the right of the accused to have the issue of manslaughter submitted will not be precluded by the fact that he attributes the killing to some other motive than passion, and au-

96 T. C.—41.

thorities are there collated.   The record in the case before us is
strongly suggestive of fear of deceased by appellant, page after page
of the statement of facts reflecting his endurance of abuse and threats
at the hands of deceased, his borrowing money to pay to deceased
upon demands which he avers he did not owe, and other matters too
numerous to mentioned but in line with the theory that appellant
was afraid of deceased and avoided a difficulty with him as long as
he could.   That deceased was a violent and dangerous man is not
disputed in the record.   It often happens that such a man when
thrown in contact with one weaker and more timid, can easily go
from abuse to threats and then to violence toward the person whose
fear of him is apparent.   Appellant had been told that deceased was
looking for him and had said  that when he found him he was going
to fix him.   That deceased was in the vicinity of said bank the night
when the homicide took place is true.   Who is to say what was the
condition of the mind of appellant when he saw deceased approach-
ing?   The evidence as to the location and condition of the wounds
on the body of deceased negatives the idea that he was one hundred
feet from appellant, as above indicated, when fired upon.   Three large
wounds in the head and body would not seem possible of infliction
by a shotgun unless the parties were near each other.   Even if the
jury should conclude that deceased did not make a threatening demon-
stration before appellant shot, can the trial court know or as a mat-
ter of law decide,—that the jury would not conclude that deceased
said to appellant that he was trying to hide, nor could the court know
as a matter of law that appellant did not believe that deceased was
going to execute the threats made by him and that this added to
other matters so aroused appellant's fear or rage as to render him in-
capable of cool reflection and to cause him to shoot and keep on shoot-
ing.   The jury might or might not find that the shooting was under
the immediate influence of sudden passion, but in our opinion the de-
cision of that question was for them, and not for the trial court.   As
was said in Pickens v. State, 86 Texas Crim. Rep., 657, 218 S. W.
Rep., 758:

"The jury may have accepted the appellant's testimony that the
meeting was a sudden and unexpected one, and have believed that this,
in connection with the previous relations of the parties and the other
facts mentioned above, produced anger, rage, or terror, such as
rendered the appellant's mind incapable of cool reflection, and that
in consequence of the passion thus aroused he magnified or misinter-
preted the conduct of the deceased, and acted in a manner so pre-
cipitate as not to excuse him entirely, but in a manner in which,
if they had been so privileged, the jury might have reduced the
offense to manslaughter.   See Rutherford v. State, 15 Texas Crim.
App., 247; Bonner v. State, 29 Texas Crim. App., 230, 15 S. W. 821;

Green v. State, 58 Texas Crim. Rep., 428, 126 S. W. Rep., 860; Lee v. State, 54 Texas Crim. Rep., 385, 113 S. W. Rep., 301; Burton v. State, 77 Texas Crim. Rep., 314, 178 S. W. Rep., 334. This view is emphasized by the fact that there was proof on the trial that the deceased at the time of the homicide was not armed. It would not be unnatural or unreasonable for the jury to reach the conclusion that appellant was mistaken in his assumption that the deceased was about to draw a weapon, if they did not believe that he shot from ambush. They might have thought he shot unnecessarily and too quick, but under excitement and passion which was adequate to and did render his mind incapable of cool reflection. We believe, under the rules prevailing, that the court was not warranted in refusing the appellant's request to instruct the jury on the law of manslaughter.''

We think the learned trial judge in error in refusing to submit the law of manslaughter.

Another matter. When the State and defendant rested their case, the learned trial judge prepared his charge and submitted it to counsel for the appellant, who thereupon presented a number of exceptions to same and also special charges which they asked to be given. It appears from a bill of exceptions in the record that after considering said exceptions and special charges, the learned trial judge changed his charge and thereafter refused to submit it to counsel for the appellant for further exception unless they themselves would agree to draw a complete charge either on self defense or threats. The requests of appellant's counsel for the privilege of examination of the charge as amended or changed, were refused finally by the court. That this was clearly erroneous under the terms of Article 737a, C. C. P. is beyond question. In the case of Czernicki v. State, 85 Texas Crim. Rep., 169, 211 S. W. Rep., 223, we held a similar action to be reversible error. In the light of the able brief filed by State's attorneys in this case we have again reviewed the matter. It is contended by the State that when the trial court refuses to submit his charge originally as provided under Article 735, C. C. P., or after same has been changed as under Article 737a, C. C. P., to the attorneys for the appellant, they can set up in the motion for new trial all matters of legitimate exception to the charge, and that the trial court primarily and this court on appeal could examine those exceptions, and if well taken, grant a new trial or reverse the case. The Legislature of this State in 1913 so amended the law as to require that the trial court submit his charge to the attorneys for the appellant before same is read to the jury, and makes it the duty of such attorneys to then take all exceptions to the charge. Article 737a specifically provides that after these exceptions have been considered, the trial court may correct or change

his charge and that he must then submit it again to the attorneys for further exception if they desire.

The course indicated in the argument and brief of the State in this case, viz: that exceptions to the charge might be presented in the motion for new trial, was the former practice before the Act of 1913 above referred to. There are many objections to such practice which we do not take time to set out. For us to now hold that the trial judges might refuse to submit their charges to the attorneys originally, as is required by Article 735, C. C. P., or after change, as is required by Article 737a, C. C. P., would practically be to repeal the Act of 1913, and could easily give rise to the universal practice on the part of trial judges of declining to submit their charges to the attorneys and thus require the latter to make and present all their objections in their motions for new trial. We do not think this to be the proper practice, nor the intent of the latter part of Article 737a, C. C. P., and we adhere to our ruling in the Czernicki case above mentioned. The record in this case shows repeated requests on the part of appellant's counsel that they be permited to examine the charge as amended and the refusal of such requests by the learned trial jurge. This we think reversible error.

For the reasons mentioned, the judgment of the trial court will be reversed and the cause remanded.

*Reversed and remanded.*