## T. V. JOHNSON v. THE STATE.

*No. 6212.    Decided June 1.*

1. **Practice—A Charge Upon Circumstantial Evidence** is not required of the court unless the evidence relied upon by the State is purely circumstantial in character.

2. **Same—Witness—Cross-Examination.**—Article 735 of the Code of Criminal Procedure provides that "the husband or wife may in all criminal actions be witnesses for each other, but they shall in no case testify against each other except in a criminal prosecution for an offense by one against the other." The spouse called to testify for the other on a criminal prosecution is subject to cross-examination like any other witness, but such cross-examination must be confined strictly to the matter about which he or she testified on the examination in chief. See the opinion for proceedings on a trial for murder held to be violative of this rule.

3. **Same—Murder—Evidence.**—The defense proved the peaceable character of the defendant, and the violent, malicious, and dangerous character of the deceased; the commission of divers acts of violence upon him by the deceased, and the threats of deceased to kill the defendant; and it was shown by the confession of defendant, proved by the State, that the defendant claimed that at the time he fired the fatal shot the deceased was making deadly demonstrations, and that he, defendant, was in serious apprehension of death or serious bodily harm. Under this proof the defense offered in evidence an indictment filed about one month before the killing, charging the deceased with an aggravated assault and battery upon the defendant about two months before the killing, which said evidence, upon the State's objection, was excluded. *Held,* that under the proof in the case, the indictment was competent evidence for the defense, and its exclusion was error.

APPEAL from the District Court of Collin. Tried below before Hon. E. W. Terhune.

The indictment in this case charged the appellant with the murder of Joseph P. Akeridge, in Collin County, Texas, on the twenty-sixth day of August, 1886. The conviction was for manslaughter, and the penalty assessed was a term of three years in the penitentiary.

The proof shows that on the day alleged in the indictment the deceased was killed on a public road in Collin County, Texas. The en-

closed land forming an acute angle, as shown by the diagram, which intervened between that road and the road known as the "lower Bonham road," belonged to the deceased, but was occupied in parcels by the defendant and others as tenants of the deceased. The lines of the acute angle formed by the roads and the fence opened at the north and converged at the south. The residence of the deceased was situated on the lower Bonham road near the south end of the angle, and that of the defendant immediately at the said south end. The house of Brewer was situated on the upper road, about midway between the defendant's house and the gate of the deceased's pasture. A red oak tree stood on the west side of the road, midway between Brewer's house and the said pasture gate. About forty yards north of the said tree, towards the said gate, the dead body of the deceased's horse was found, and a few feet north of the body of the horse was found the body of the deceased. The road leading from the deceased's residence to his pasture passed the defendant's house at a short distance.

Dr. W. C. Holmes was the first witness for the State. He testified in substance that he reached the body of the deceased about 2 o'clock on the morning of August 26. A red oak tree surrounded by brush stood on the west side of the road, and at a point between thirty and forty feet north of the said tree the witness found the dead body of the deceased's horse. The horse lay on his right side with his head pointing south and his hind quarters north toward the pasture gate. He had been killed by an ordinary buckshot, which penetrated the brain through an eye. Deceased's body lay in the road about six feet north of that of the horse. Witness counted eighteen distinct buckshot holes on the left side of the neck, making a wound two and a half inches square, which ranged downward, cutting the jugular vein and, in the opinion of the witness, severing the spinal cord. This wound was necessarily and instantaneously fatal. There was also a buckshot wound in each shoulder and a pistol shot wound in each side. The two pistol shot wounds must have been inflicted before the circulation of the blood was suspended. The circulation of blood would stop between three and five minutes after the infliction of such a wound as that on the left side of the deceased's neck. A thirty-eight calibre cartridge pistol ball was found embedded in the ground at the place where deceased was killed. The point where the killing occurred was bounded on the east by deceased's enclosed field—the fence being about fifteen feet from the road—and on the west by thick brush. The fatal shots must have been fired from short range. If deceased was on his horse riding south a person at the red oak tree could not have inflicted the wound in the left side of his neck. Moreover it was evident that the wounds were inflicted from a closer range than that made by the distance between the tree and the body of the horse. The horse had on a bridle and saddle.

Will Morgan testified for the State in substance that he was one of the tenants cultivating the field of the deceased at the time of the tragedy. At the time of the killing he was picking cotton at a point about six hundred yards northwest from deceased's house and north of the defendant's house. The killing occurred on the evening of August 25, 1886. Witness heard deceased calling hogs in his field that evening, and between 15 and 30 minutes afterwards he heard four shots fired at or near the place where deceased's body was afterwards found. The first two shots were fired in rapid succession, and the third and fourth after short intervals. Within the next ten minutes the defendant called to witness from his, defendant's, cotton patch. Witness's brother answered, when defendant hallooed, "You and Will come here." The witness and his brother started to the defendant, when the defendant turned and went west to the fence, got over it into the road, and went north out of sight. About the time witness and his brother reached the fence they were joined by defendant, who had returned. Defendant reached over the fence and got his gun. He then said, "Me and Akeridge had a racket out here and I killed him." Witness's brother expressed incredulity, and defendant said, "Yes, I did; I hated to do it." Witness and his brother crossed the fence, and defendant remarked that he had also killed the deceased's horse; and as the party approached the body defendant said, "He said he was going to kill me before I left here. I heard it a couple of hours ago, and I came up here and stationed myself, and as he came by I tackled him, and asked him if he said it. He said, 'Yes, by God! and I will do it!' and started to run, and I cut him down." Defendant then said, "Well, the first thing he did was to make a motion to run his hand into his hip pocket, but I don't know whether he had a pistol or not. I would not leave him until somebody got here." Defendant repeated his declaration that deceased attempted to thrust his hand in his pocket, and added that he, defendant, did not intend to run away. Deceased, when found by witness, was lying on his back across the road, his head a little north of west and his feet a little south of east. His right arm lay across his breast, his right hand clutching a riding switch. Otherwise this witness described the ground, position of the horse's body, etc., as did the witness Dr. Holmes, stating in addition that the deceased was in his shirt sleeves, and that an empty oat sack was found near the body. He stated further that he remained with the body while his brother and defendant went after assistance, and knew that the body was not touched while in his charge. He saw no weapons on the body, and saw no indication of a struggle on the ground near the body. James Armstrong, Jr., was the first person to reach the body after defendant and witness's brother left. On his cross-examination the witness said that he had no recollection of repeating to Armstrong the statements made by defendant. He did not tell Armstrong that defendant said that when he asked

deceased if he had threatened his life, deceased replied, "Yes, by God, and I mean it," and that deceased then attempted to thrust his hand into his pocket, when he, defendant, "cut down on him." Deceased was in the habit of personally attending the stock in his pasture, going to the pasture twice a day.

The State next read in evidence the written testimony of D. J. Morgan, as delivered on the habeas corpus trial. It was substantially the same as that of his brother, the preceding witness. According to this witness defendant's statement soon after the killing was as follows: "I heard he said he was going to kill me, and I met him up here and tackled him and asked him if he said it. He said he did, when I raised and shot. I killed his horse the first shot, and the next shot killed him. I thought he dropped his hand down to his side and was going to run." Defendant also said that deceased put his hand to his side, but that he did not know whether or not deceased had a pistol.

John Perry testified for the State that after the habeas corpus trial of the defendant, and while he was at large on bond, the defendant, in talking to him about the killing, told him that while in his field on the morning of the fatal day he was told that deceased had threatened to kill him; that he took his gun with him to the cotton patch that evening; that when he saw deceased going to his pasture that evening he determined to see him about the threat; that he followed and encountered the deceased at the pasture gate, and asked him if he had that morning threatened to kill him; that deceased replied, "Yes, by God! and I meant it," and threw himself back, thrusting his hand into his pocket; that he, defendant, then fired, killing the horse; that he then shot deceased, and after he fell shot him on one side with a pistol and then walked around and shot him in the other side with the pistol.

Will Morgan, being recalled by the State, testified that on the evening of and after the killing the defendant told him that deceased laid in the brush near his, defendant's, house all of the evening preceding the killing.

The material part of the testimony of Mrs. Sallie Akeridge, the widow of the deceased, was that the deceased owned two pistols and a shot gun, all of which weapons were in the house at the time of his death. Deceased was in his shirt sleeves, wearing neither coat nor vest when killed. The justice of the peace who held the inquest on the body of the deceased testified that no weapon other than a pocket knife was found on the body when searched. The State rested.

Thomas Bratton testified for the defense in substance that he had a conversation with deceased on the morning of the fatal day. Witness was then a tenant of deceased, and the conversation occurred in witness's cotton patch. Deceased referred to trouble with defendant about stock. He cursed defendant, applied abusive epithets to him, and said that he

could not let such a man live on his place, and that he intended to kill defendant before he left the place. The witness then observed something in deceased's pocket which, from its shape, he took to be a pistol. He knew that deceased customarily carried a pistol, a fact notorious in the neighborhood, and well known to defendant. Soon after this, on the same morning, the witness met defendant and repeated to him the threats of deceased. The reputation of the deceased in the neighborhood was that of a violent and dangerous man; that of the defendant, a quiet, peaceable, law-abiding man.

James Armstrong testified for the defense that he saw the deceased about two o'clock on the fatal day. In the course of a tirade against defendant the deceased said, "He shall never work another foot of land, God damn him!" On the previous Monday while at witness's house the deceased, in the course of some talk about Johnson, asked the witness what he, witness, would think of a man who would pull down another man's fence. He did not specifically charge defendant with injuring his fence. Witness advised deceased to let defendant alone, as defendant might hurt him. Deceased replied, "A barking dog won't bite." Witness knew as a fact that deceased had a pistol in his pocket on that occasion. This witness testified as did the preceding witness about the reputations of deceased and defendant for peace or violence.

Freeman Armstrong testified for the defense in substance that on the second day preceding the killing he met deceased at Jim Armstrong's house. On that occasion deceased sought a private interview with witness, in the course of which he complained that some person was constantly throwing down his fence. He said he was satisfied defendant was the man who was continually throwing his fence down; that he was tired of it, and that the fence would be thrown down not more than twice after that before he would put a stop to it. He then said that he wanted to make a trade with witness, and remarked: "I have $1000 in bank in McKinney and $400 or $500 at home. I want Johnson out of the way, and I will give you half of that money to put him out of the way. If I can't get somebody else to do it I will put him out of the way myself before Saturday night." On his cross-examination the witness stated that he told defendant before the killing that deceased had said he would kill him (defendant) before Saturday night. He told Bud Drye that deceased had offered to provide him with a good 44-calibre pistol with which to kill defendant. To deceased's proposal to kill defendant the witness replied that he would not kill Johnson, as he did not want to ruin the peace of his family for life by so doing. Deceased replied that witness could kill defendant and easily avoid detection.

J. W. Reeves testified for the defense in substance that he was with defendant on the night of June 19, 1886, when defendant's little son reported that deceased and Freeman were at his, defendant's, house, drunk

and cursing. Defendant went home, and witness, after getting his supper, went to defendant's house, taking his gun with him. Soon after witness got to defendant's house he heard voices hallooing near deceased's house. The parties soon came to a point near defendant's house, when one of them exclaimed, "Whoop! hurrah for hell and half of Georgia! The kuklux have rose, and God damn a man who wont take up for his country!" Defendant called to the parties, "Gentlemen, what in the hell do you mean?" The parties cursed defendant and dared him out. Defendant then took his gun and went out to the fence, and as he reached the fence one of the parties fired at him with a pistol. Defendant returned the shot, and deceased then fired at defendant, the ball striking defendant's house. Defendant returned that shot, and came back to the house. Thirty minutes later the witness saw deceased going towards his house with a little boy. Defendant's wife and his five small children were in the house at the time it was fired upon. Deceased frequently told witness that he never left home without a pistol, and that if he could not control a renter he always ran him off or killed him. Deceased's reputation was that of a violent, dangerous man, who would execute a threat. Defendant was generally reputed to be a quiet, peaceable man.

Dave Brinlee testified for the defense that in talking to deceased about the defendant, pending proceedings in court which grew out of the episode of June 19, he remarked to deceased that defendant was a dangerous man. Deceased replied, "I can take a corn-cob, put a lightning bug on the end of it, and run him out of the county."

Mrs. Hallie A. Johnson, the wife of the defendant, testified in his behalf that she was also the blood niece of the deceased. She described the assault on defendant's house on the night of June 19 by deceased and another party whom she did not recognize substantially as the witness Reeves did. Defendant did not speak to deceased, nor do anything to provoke him on the said evening. On Tuesday of the week preceding the homicide the deceased came to defendant's house to get some memorandum books by which to fix certain dates. Witness got him the books and then followed him to the fence. At the fence, as he was going off, deceased asked her if she was going to swear against him in the prosecution for shooting at the house. Witness replied that she would if required to. He said in reply, "If you do I will kill Ves Johnson (defendant), and if you were not blood kin I would cut your throat." About dusk on the Monday preceding the fatal Wednesday the deceased, riding a roan pony, came to a point near defendant's front door and called to defendant in a disguised voice. Witness looked out and recognized deceased, and told defendant who the party calling was, and advised him not to answer nor to go out. Defendant came to the house at 12 o'clock on the day of the killing and went back toward his cotton patch at ten

minutes past 2, his two little boys going with him. He did not come home again until after the killing of deceased.

The cross-examination of this witness constitutes the subject matter of the main ruling in this case. It in no wise affected her testimony in chief, but in answer to questions by the State's counsel, over defendant's objection, the witness stated that she did not see defendant take a gun or pistol with him to the field on the fatal evening, but she missed the gun after he left. He brought his gun and pistol back home that evening, and witness observed that two chambers of the pistol were empty. Re-examined the witness said that she was present when the conversation between defendant and John Perry, the State's witness, took place. Henry Bratton and Wash Reeves were also present. Defendant told Perry that he went to his cotton patch that evening, and concluded to go to Mrs. Brewer's for help to pick his cotton; that when he reached the lane he saw deceased traveling so as to be behind him; that he was afraid to walk in front of deceased, and for that reason turned and met him, and said, "Stop, Uncle Joe;" that deceased did not stop, and he again called upon him to stop, adding, "I want to see you;" that deceased then reined up his horse, and he said to him, "I have heard, Uncle Joe, that you have threatened to kill me; is it true?" That deceased replied, "Yes, by God, it is true, and I mean it!" That deceased then thrust his hand into his pocket, and he, defendant, fired, killing the horse at the first shot and the deceased at the second. He said nothing to Perry about shooting with a pistol.

N. M. Drye testified for the defense that on the eve of this trial Freeman Armstrong told him that deceased once offered him the half of $1500 and a Smith & Wesson pistol if he would kill the defendant.

Jake Armstrong testified for the defense that he saw the deceased near his, deceased's, house late on the Monday evening preceding the tragedy. He was on a small roan pony and had a small dog following him. He rode off and witness did not see him again, but a while later the witness saw the dog standing in the road about forty yards distant from the defendant's house.

Henry Bratton, testifying for the defense, corroborated the testimony of Mrs. Johnson as to the conversation which took place between the defendant and John Perry on the evening of and after the killing, narrating that conversation circumstantially as Mrs. Johnson did.

James Armstrong, Jr., testified for the defense that he was at the body of the deceased soon after the killing when it was in the charge of Will Morgan. Nobody else being present, the said Morgan told witness that defendant said the deceased reined up his horse when he, defendant, said to him: "Uncle Joe, I have heard that you said that you intend to kill me. I want to know if you mean it?" That deceased said, "Yes, by God!" and ran his hand into his pocket, and that he then shot deceased. He

did not quote the defendant as saying that deceased started to run away. Witness heard Morgan make that statement as quoting defendant on two different occasions. Morgan said nothing about defendant calling him and his brother, nor did he quote defendant as saying anything about the killing of the horse or about the number of shots that were fired.

J. F. Bradshaw testified for the defense that soon after the deceased was killed Will Morgan told him in the presence of Reeves, Brewer, and Jim Armstrong that defendant told him that he, defendant, met deceased in the road and said to him: "Uncle Joe, I hear that you have said you intend to kill me. Did you mean it?" That deceased replied, "Yes, by God, and I will do it!" and thrust his hand in his hip pocket, and that he, defendant, then "cut down on him."

Abe Cameron testified for the defense that a short time before the killing the deceased, in a conversation about deceased's hogs getting into defendant's cornfield, said, "The damned son-of-a-bitch won't be here another year to bother me."

A large number of witnesses testified that the deceased had for years borne the reputation of being a violent, quarrelsome, and dangerous man, and that the general reputation of the defendant was that of a quiet, peaceable, law-abiding man. The defense closed.

Several witnesses testifying for the State, in rebuttal, supported the reputation of deceased as a quiet, peaceable man, each declaring that he did not sustain the character of a violent, dangerous man. But on cross-examination each of the said witnesses admitted that they knew of deceased having a great many difficulties and quarrels, or "fusses." Several of the said witnesses testified that the reputation of Will and D. J. Morgan for truth and veracity was good.

Mrs. Akeridge, recalled by the State, testified in rebuttal that her husband was at home at and for some time before and after dusk on the Monday evening preceding the killing.

Grace Akeridge, the son of the deceased, testified for the State in rebuttal that he was present when the difficulty near the defendant's house occurred on the night of June 19, 1886. Will Madding and deceased at that time were taking Freeman Armstrong home, the said Armstrong being very drunk. When near the house of defendant, Armstrong hallooed, "Hurrah for hell!" and a man, witness could not say who, came out of defendant's house and fired a shot. Somebody in the party returned the shot, but it was not deceased. Deceased neither said nor did anything on that occasion.

*Jenkins & Pearson* and *J. W. Throckmorton* filed an able and exhaustive brief for the appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Without discussing at length any of the supposed errors of omission or commission urged in the oral argument and brief of counsel for appellant to the charge of the court, suffice it to say that in our opinion the charge was a most able enunciation of the law of the case. The case was not one of circumstantial evidence. Appellant confessed and never denied that he himself, and he alone, killed Akeridge, and there was no controversy at all as to that fact. A charge upon circumstantial evidence is not demanded in such a state of case. Eckert v. The State, 9 Texas Ct. App., 105.

The defendant introduced his wife Hattie A. Johnson as a witness in his behalf. On her direct examination she was asked no question about any gun or pistol, but was examined about threats made by deceased to her, and about the difficulty on the 19th of June prior to the homicide, and about the defendant's whereabouts on the day of the homicide. On cross-examination she was asked by the State's counsel questions about a certain gun and pistol with which defendant is said to have perpetrated the homicide. Defendant objected and took a bill of exceptions. She then testified, over defendant's objections, that defendant took a gun to the field with him; that she did not see him carry the gun, but saw him bring back the gun and a pistol after the homicide, and that she examined the pistol and found two chambers empty. No other witness testified about seeing any pistol or about the two empty chambers of the pistol. John Perry testified that defendant told him a year after the killing that he shot deceased twice with a pistol, and that defendant's wife and Henry Bratton were present when defendant made that statement. After defendant's wife had been cross-examined she was re-examined about the declarations of her husband to John Perry, and she then said she was present when defendant gave an account of the killing to John Perry, and that her husband said nothing about shooting deceased with a pistol. But witness never testified on either her direct or re-examination anything about her husband carrying a gun or a pistol to the field on the evening of the homicide, or about bringing back a gun or a pistol after the homicide, or about two chambers of the pistol being empty. Among the qualifications to this bill of exceptions by the court was this: "In my opinion when defendant puts his wife on the stand as a witness in his behalf upon any fact connected with the homicide, the State may legitimately draw out of her any fact she may know connected therewith, unfavorable to his defense, or favorable to the prosecution."

Under our statute "the husband and wife may in all criminal actions be witnesses for each other, but they shall in no case testify against each other except in a criminal prosecution for an offense by one against the other." Code Crim. Proc., art. 735. In construing this statute with reference to the extent to which the right of cross-examination may be carried by the State where one spouse has been called to testify for the

other, it is said that "whilst it is true the spouse is subject to cross-examination like any other witness, it is also true that such cross-examination must be confined strictly to the matters about which she has testified on the examination in chief." Washington v. The State, 17 Texas Ct. App., 197, citing Creamer v. The State, 34 Texas, 174, and Greenwood v. The State, 35 Texas, 587. It was error to allow the cross-examination as to matters complained of in the bill of exceptions. "It was indirectly causing her to testify against her husband." Id. See also Willson's Crim. Stats., sec. 2443.

Defendant's second bill of exceptions was saved to the refusal of the court to permit him to introduce in evidence the indictment which had been presented against the deceased, Akeridge, charging him with an aggravated assault and battery upon defendant on the night of June 19, 1886, which indictment was returned into court in July, 1886, about a month before the killing. Both the character of defendant as a peaceable and law abiding man and that of deceased as a violent and dangerous man had been put in issue. Defendant proposed to avail himself of the indictment as a circumstance going to establish both these issues. As to his own character, because it showed that when assaulted by deceased he had appealed and resorted to the law for protection; and as to the character of deceased, it having been already proved by some of his witnesses that deceased had made violent threats against his, defendant's, life, that he had attacked defendant's house in the night time, that he had threatened to cut the throat of defendant's wife if she testified against him, and that he had offered to pay one of said witnesses $750 if he would kill defendant, the said rejected evidence would tend most strongly to show an additional motive and reason for hostility and violence upon the part of deceased towards defendant.

In his confession, or rather admission, of the fact that he had killed deceased, defendant stated that deceased had made demonstrations as though about to draw a weapon at the time he, defendant, fired upon him. In other words, that he was in serious apprehension of death or serious bodily injury at the time he did the shooting. "The issue being, 'had the defendant reasonable grounds for fearing death or serious bodily harm?' to decide this question correctly, the exact relations of the parties to one another, their feelings towards each other, and their motives should be known to the jury. These being understood, an act, gesture, or word which was spoken or done at the homicide is viewed and weighed in the light of these remote relevant facts as well as the immediate facts." Russell v. The State, 11 Texas Ct. App., 288.

Defendant proved that deceased was a malicious and dangerous man. The State introduced evidence to the contrary, and hence a conflict. Upon such an issue the indictment against defendant for aggravated assault and battery was competent and admissible evidence. Brunet v.

The State, 12 Texas Ct. App., 521. It tended to show an additional reason and motive for hostility on the part of the deceased towards defendant. Rucker v. The State, 7 Texas Ct. App., 549. We are of opinion that the court erred in rejecting this evidence.

For the errors we have pointed out and discussed the judgment is reversed and cause remanded.

*Reversed and remanded.*

Judges all present and concurring.