## J. N. BURTON v. THE STATE.

### No. 3532. Decided April 21, 1915.

### Rehearing denied June 2, 1915.

1.—Murder—Manslaughter — Charge of Court — Provocation—Antecedent Circumstances.

Where, upon trial of murder, the evidence raised the issue of manslaughter, viewed in the light of all the circumstances of the case, and the court in his charge on manslaughter, failed to instruct the jury in passing on the provocation at the time, that they should take into consideration all the antecedent circumstances in evidence, the same was reversible error. Prendergast, Presiding Judge, dissenting.

2.—Same—Evidence—Immateriality of Testimony.

Where certain testimony was admitted, which was not material to any issue in the case, the same should not be admitted on another trial.

Appeal from the District Court of Roberts. Tried below before the Hon. F. P. Greever.

Appeal from a conviction of murder; penalty, seven years confinement in the penitentiary.

The opinion states the case.

*J. F. Cunningham,* for appellant.—On question of court's charge on manslaughter: House v. State, 171 S. W. Rep., 206; Reagan v. State,

157 S. W. Rep., 485; McHenry v. State, 54 Texas Crim. Rep., 477; Barnes v. State, 57 Texas Crim. Rep., 449, 133 S. W. Rep., 887.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of court's charge on manslaughter: Ex parte Jones, 31 Texas Crim. Rep., 422; Hurst v. State, 40 id., 378; Honeycutt v. State, 63 S. W. Rep., 639; Herrington v. State, 63 S. W. Rep., 562; Sargent v. State, 35 Texas Crim. Rep., 325; Carson v. State, 43 id., 265; Anderson v. State, 43 id., 275; Scott v. State, 43 id., 591; Thomas v. State, 49 id., 633; Bruster v. State, 50 id., 147; Hightower v. State, 53 id., 486; Arnwine v. State, 54 id., 213; Kannmacher v. State, 51 id., 118; Hatchell v. State, 47 id., 380.

HARPER, JUDGE.—The killing took place in Lipscomb County on the 20th of July last. The venue was changed to Roberts County, and when tried appellant was adjudged guilty of murder and his punishment was assessed at seven years confinement in the State penitentiary.

There is but one serious question in the case—does the evidence raise the issue of manslaughter? The trial court seemed to think so, and submitted that issue to the jury, but if the evidence raises the issue the charge as given was not applicable to the facts in the case. He instructed the jury: "By the expression 'under the immediate influence of sudden passion' is meant, first, that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of former provocation. Second, the act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by passion arising from some other provocation." This defines adequate cause as it is defined in the statute, and so far as it went it is a correct exposition of the law. But if there is manslaughter in this case it is by reason of the antecedent circumstances operating on the mind of defendant in connection with what took place at the time of the killing, and the court while instructing that the provocation must arise at the time of the killing should also have instructed that in passing on whether the provocation that did occur at the time of the killing would be adequate cause to produce a state of anger, rage, sudden resentment or terror rendering the mind incapable of cool reflection, they should take into consideration all the facts and circumstances in evidence, and if they found that the provocation occurring at the time, viewed in the light of the antecedent circumstances, was such as to produce and in fact did produce such a state of mind, the killing would be of no higher grade of offense than manslaughter. The State's evidence supports a finding that the killing was of the grade of murder, and unless the evidence in the case raises the issue of manslaughter, the judgment should be affirmed, for an error in the charge on manslaughter in not properly submitting the issue of adequate cause, would not present error, if in fact no such issue is in the case. (Eggleston v. State, 59 Texas Crim. Rep., 542.) It is the general rule that the circumstances and conditions which con-

stitute adequate cause are not restricted to those named in the statute; other causes may exist, and if there is evidence which supports the theory of adequate cause, the court is not to judge of its probable truth, but should leave it to the jury under proper instructions. Wadlington v. State, 19 Texas Crim. App., 266; Childers v. State, 33 Texas Crim. Rep., 509; Rice v. State, 51 Texas Crim. Rep., 255; Sterling v. State, 15 Texas Crim. App., 249; West v. State, 2 Texas Crim. App., 460; Johnson v. State, 43 Texas, 612. Of course, if the evidence only raises the issues of murder and perfect self-defense, no charge on manslaughter is required. An act standing alone may not be sufficient, but may be ample when preceded by an aggravating course of conduct. Johnson v. State, 22 Texas Crim. App., 206; Lierpo v. State, 28 Texas Crim. App., 179; Baltrip v. State, 30 Texas Crim. App., 545; Adams v. State, 42 Texas Crim. Rep., 366.

With these well established rules of law in mind, do the facts and circumstances in the case raise the issue of manslaughter with that force and cogency as to require a correct charge, applicable to the facts in evidence, be given?

Appellant was the tenant of W. H. Parker, the deceased, and had been his tenant for some four years, but this summer over some disagreement, not made clear by the record, deceased became desirous of severing that relation. Appellant was cropping on shares. In addition to the usual one-half of the crop raised, he was to attend to deceased's stock, and was to receive as compensation therefor one-half the increase of the stock. Appellant says that during the years he had been on deceased's farm and ranch, as increase, there were seventeen head of horses and colts and forty-seven head of cows and calves, of which he would be entitled to one-half. Deceased's son, Vernon Parker, admits that appellant had this trade with his father, but his understanding was that his father had paid appellant for his interest in the horses. Appellant says he had an interest in the plow tools and harness, and the wagon was his own. Appellant says that in 1914 there was made on the place 3500 bushels of wheat, 980 bushels of barley and oats, and 160 acres planted in kafir corn and maize, one-half of all of which he was entitled. It further appears by the record that appellant was indebted to the merchants with whom he traded about $800, for which sum Mr. Parker, the deceased, was surety. It does not appear that appellant owed any other debts except to his farm help. On Tuesday of the week before the homicide appellant sent two loads of wheat to market and had the proceeds placed to his credit at the bank. Deceased, learning of this, had the money changed to his credit. On Friday before the homicide, appellant started two more loads of wheat to the market, and one of the drivers of the wagons, Williams, says that night deceased came to where they were camping and asked what they had done with the other wheat, and when he told him he placed the money to Mr. Burton's credit, "He said, what are you going to do with this? I said, I am going to do the same thing; he said, no, you can not do that. I said, why, and he said, because I am not going to let you

do it; that kind of got me to studying and he said he would stand between me and Mr. Burton. I said, Mr. Burton will charge me up with that wheat, and he agreed to stand between us and I did that. That was not all of the conversation; he told me that he was going up there to the ranch on Monday and he was going up there and make Burton move off, he said Burton can take three horses, one set of harness, one wagon and what traps he had and throw them in the wagon and move. He did not tell me to tell Burton that. I did not say anything to him in particular. I told him I did not think he could scare Mr. Burton. I did not think he is that kind of a man. He did not exactly say how he was going to move him off. He said he would not take his sixshooter with him when he went up there, he said he would leave that at home, he said if I take it up there I am liable to kill him."

Mr. Ammerman, the other driver, says: "The conversation came up about the wheat check, about who was to get the checks, money for the wheat; we told him how it was to be. My cousin was with me, he hauled a load before that; he asked him what he done with it, he told him that he deposited the money to Mr. Burton—Mr. Williams is my cousin. He asked him what he was going to do with that; we told him the same as we did with the other; he objected and said he would not stand for that, for us to sell the wheat that way; we told him we would have to sell it that way; he said he wouldn't let us sell it that way; he went on and said about what he was going to do; he said he was going to Higgins when he got to Glazier and get some papers made out to get possession of the place, he was going up there and run Mr. Burton off the place, he was going up there on Monday, he said he was going to let him take three horses, a wagon, a set of harness and what old traps he could get in the wagon; he went on and said that he would have to leave his gun at home; well, he said if he didn't, he used a little language that don't go well before ladies. He said if he didn't leave his gun to home he might have to kill the old son-of-a-bitch."

These men say when they returned on Sunday night they did not tell Mr. Burton what Mr. Parker had said—only told him about Mr. Parker meeting them and taking the money for the wheat.

On Saturday Mr. Parker did sue out distress proceedings, but not being made out correctly, he decided to go to the farm Monday and see if he could not settle the matter, making arrangements with Dr. Newland, if he could not settle he would phone him and for Dr. Newland to come after him in an automobile, and he would sue out a distress warrant. After he decided to go to the farm he had his pistol cleaned, the sheriff saying he advised him not to take it with him, and Mr. Parker said he would not do so. However, he did take the pistol with him, and had it in his right hand pants pocket. On Monday deceased and his son drove to the farm, finding appellant in the blacksmith shop. Appellant says he saw the pistol while they were at the shop, but as deceased said he came after a load of wheat, they all went to the field together and loaded the wagon with wheat. After the wheat

was loaded, the version of Vernon Parker and appellant differ in some particulars. Vernon says when the wagon was loaded his father told Mr. Burton he had a proposition to make him; that Burton sat down on his bucket, when his father told him he would let him (Burton) have the wagon, one or two sets of harness, and three or four horses that he claimed; pay two hands, and give him one hundred acres of the maize and kafir corn; that he (deceased) would have to pay the store bill, and it would take the remainder to pay it. Burton declined the proposition and got up and went to the blacksmith shop, 300 yards distant.

Burton says that when the wagon was loaded deceased placed his hand on his pistol, and told him he had a proposition to make to him— that he would let him have the four horses, one set of harness and the wagon, and he must move right off. That when he declined this proposition, deceased said, "You will take this." Becoming alarmed he left and went to the blacksmith shop.

It further appears that when they drove out of the field, there were two roads—one that led in the direction of Parker's home, and the one he usually traveled; the other went by the blacksmith shop, where Burton had gone, and on by to the barn. Vernon says the reason they took this road, they did so to go by the barn to get some oats. Burton was not made aware of this fact. Vernon says his father was using both hands in driving the team, and just as he got past the blacksmith shop Burton jumped out, with a shotgun leveled, and said, "Parker, drop that gun or I will kill you"; that his father then reached for his pistol, and Burton fired, killing him. Burton says he supposed by Parker taking this road he was coming to the shop to again take up the settlement and put him off the place. That when he looked Parker had the lines in his left hand, his right hand being in his pocket where he had seen the pistol; that he grabbed his gun, and said, "Parker, drop that gun," but instead of dropping it he looked as if he was trying to get it out of his pocket, and he shot.

It is thus seen that what took place at the immediate time of the shooting would present the issue of self-defense, from appellant's standpoint, and the acts and conduct there alone would not be adequate cause to reduce the offense to manslaughter, nor raise that issue, but if deceased was driving along and Burton jumped out before Parker made any demonstration and told him to "drop the gun," and then it was Parker attempted to get his pistol, it would be murder. But to view the entire case from appellant's standpoint, he contends that he was entitled to one-half interest in seventeen head of horses, forty-five head of cattle, one-half of 3500 bushels of wheat, and one-half of the oats, barley, kafir corn and milo maize, and if so he would be much more than able to pay the $800 debt—in fact, there would be left a surplus of some $500 or $1000 as his part. Parker was trying to put him off the place in the middle of the year—in July. He had sent wheat to town, and Parker had intercepted it, and appropriated the proceeds, and then came out armed, and told him he must accept his propo-

sition,—take four head of horses, a set of harness, and a wagon, and move off. He left the field, and if Parker had gone his usual road of travel there apparently would have been no killing that day. But viewing the matter from Burton's standpoint, and as he testifies, Parker does not take the usual road of travel, but takes one that will carry him directly to or by the blacksmith shop, puts his right hand on his pistol, and drives directly towards where Burton has gone, Burton saying he thought he was coming to force him to accept his proposition and move off. Would this conduct, viewing it as it appeared to Burton, in the light of the preceding matters, be likely to engender in an ordinary mind that degree of anger, rage or resentment as would likely render his mind incapable of cool reflection? If so, it would be proper to submit that issue to the jury, and if they so found, he would be guilty of manslaughter and not murder. We have read this record more than once, and we are of the opinion that it raises the issue of manslaughter, viewed in the light of all the circumstances in the case, and the court erred in not instructing the jury the law of manslaughter as applicable to that state of facts—in passing on the provocation at the time they should take into consideration all the antecedent circumstances in evidence.

While we would not reverse because evidence of the weight and height of Parker was admitted in evidence, yet such testimony is material to no issue in the case, and on another trial it should not be admitted.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, PRESIDING JUDGE.—A careful consideration of all the evidence demonstrates manslaughter is not raised. Self-defense only was. The court charged fully on self-defense. This judgment should be affirmed and not reversed.