# W. Fred Jones v. State.

No. 24287. May 2, 1949.
Rehearing Denied May 18, 1949.

*Frank Day,* of Plainview, *E. T. Miller,* and *Simpson,* Clayton & *Fullingim,* (acting by E. A. Simpson) of Amarillo, for appellant.

*Lloyd Croslin,* District Attorney, of Lubbock, *John Stapleton,* District Attorney, of Floydada, *Lucian Morehead* and *Meade F. Griffin,* of Plainview, *L. A. Wicks,* of Ralls, and *Ernest S. Goens,* of Austin, for the state.

GRAVES, Judge.

Appellant was charged with murder with malice of H. C. Love, Jr., and by the jury assessed the death penalty, and he appeals.

This cause has heretofore been before this court and is reported in 151 Tex. Crim. Rep. 115, 205 S. W. (2d) 950, where the facts are fully set forth, thus not necessitating a restatement thereof except in certain instances not adequately covered therein, unless it be necessary to show the relevancy of any new testimony.

The record herein is voluminous, the transcript being composed of 175 pages, the briefs containing 177 pages, and the statement of facts, 183 pages, thus evidencing much labor in an endeavor to assist this court in a proper understanding of the matters there presented; and the attorneys on each side of this controversy have been very helpful to this court in their exhaustive briefs on file herein.

Bill of Exceptions No. 1 contains the objections and excep-

tions to the charge of the trial court and will be later treated herein.

Bill of Exceptions No. 2 relates to a question by appellant to a state's witness concerning the conduct of appellant and his party at a restaurant where they were having prepared and were eating some steaks on the night in which the homicide took place. Upon cross-examination by appellant's attorney, the following occurred:

"Q. Now, my question is, while you all were eating those steaks at any time in the hour or hour and a half, that you say you all stayed at that cafe, did you hear anybody in the party say anything or do anything that to your mind indicated anger towards anybody else in the party? A. Yes.

"Q. What? A. I heard Fred say something about headlines in the paper next morning about murder."

The appellant's attorney objected to this answer as not being responsive to his question and asked that such statement be withdrawn from the jury and stricken from the record. This same matter arises again in Bill No. 18 when the state's witness, John Lackey, was queried as follows by the state.

"I did have a conversation with Fred Jones. There was something of an unusual nature that attracted my attention in his conversation that night. He said, 'What would I think to pick up a paper the next morning and the headlines were Fred Jones had murdered a man and Johnnie Lackey, a prominent farmer from Cedar Hill, was an accomplice to it.' "

Appellant's attorney objected to such question and its answer and took an exception to the trial court's ruling thereon. Again, this matter appears in Bill No. 15, when undergoing cross-examination by the state, appellant was interrogated relative to having made this remark to the witness Lackey, this remark being the basis of Bills Nos. 2, 10, 15 and 18, and it being objected to in every instance when the same was referred to. We are impressed with the fact that appellant's attorney brought this fact into the case by his questioning of the witness, Poss Dillard, not only as to whether there was any showing of ill-will by anyone at this cafe, but also "what" such showing was. It is shown that such remark was made at about an hour or an hour and a half prior to the homicide and evidently was utilized by the state in an effort to show a malicious intent upon appellant's part at such time. We think the matter stands in a peculiar light of its own, not being brought forth by the state,

and we also think such an answer, though doubtless unexpected, was responsive to the question.

An accused may not bring out objectionable testimony and then predicate error upon the refusal of the court to strike it from the consideration of the jury. See Crowley v. State, 117 Tex. Cr. R. 372, 35 S. W. (2d) 437; Bruce v. State, 31 Tex. Cr. R. 590, 21 S. W. 681; Weaver v. State, 112 Tex. Cr. R. 546, 17 S. W. (2d) 1066. To do so, we think, would allow one to take advantage of his own wrong. We think this matter evidences no error, and thus disposes of Bills Nos. 2, 10, 15 and 18. See Norton v. State, 129 Tex. Cr. R. 503, 88 S. W. (2d) 1045; Langley v. State, 129 Tex. Cr. R. 254, 86 S. W. (2d) 755.

It is noted in connection with Bill No. 10 that the proceedings preliminary to the questions and answers of the witness, Poss Dillard, are set forth in great length as certified to by the trial court who, in his qualification to Bill No. 10, states that he was of the opinion that the answer of the witness Dillard was responsive to the questioning of appellant's attorney and was admissible, and he allowed the answer thereto to remain with the jury.

Bill No. 15 also relates to this complained of remark claimed to have been made to John Lackey by appellant, the appellant being queried in said bill relative to having made the same to Lackey. The making of such statement was denied by appellant, and we think that the matter being properly before the court, the state had the right to attempt to prove same by appellant, and his denial thereof might be heard for what it was worth before the jury.

Bill No. 18 is based on an objection to allowing John Lackey to testify that while this company of six people were waiting for the preparation of their steaks, appellant said to Lackey:

"It would be something to see in the headlines in the paper in the morning that Fred Jones had murdered a man and that John Lackey, a prominent farmer of Cedar Hill, was an accomplice to it."

From what we have said, we think this testimony became admissible because of the questioning of the witness Dillard; and also to show the circumstances leading up to the final homicide and the condition of the mind of appellant; and it would also have some value in determining the existence of malice, that is, a heart regardless of social duty and fatally bent on mis-

chief. See Art. 1257a, Vernon's Ann. Tex. P. C., also McArthur v. State, 132 Tex. Cr. R. 447, 105 S. W. (2d) 227; Kelley v. State, 133 Tex. Cr. R. 460, 112 S. W. (2d) 470. This testimony of the witness Lackey certainly tended to show that the condition of appellant's mind at such time was dwelling on the offense of murder, such being in point of time some hour and a half prior to the time in which the homicide was committed which took the life of one of the parties then present. Furthermore, appellant having initiated the inquiry into this statement, we think the state was entitled to go into the whole on the same subject of the act, declaration, or conversation, under Art. 728, C. C. P.

We note the doctrine offered by appellant that where a general threat is made without showing that the deceased was included therein, that it is necessary to show by other testimony that same was directed to such deceased person. In other words, a vainglorious boasting relative to one's physical prowess or one's great determination to carry out any intention that he might have formed without a direct intimation that such was directed at the victim of his later violence would not be sufficient to allow such general threat to become admissible. It is observed, however, that the intent with which such threat was offered can oftentimes be shown by a subsequent action such as in this case, appellant doubtless reached the headlines of the papers the next day by taking the life of one of the parties present and doubtless within the sound of his voice about an hour and a half prior to the homicide.

Bill No. 3 complains of the argument of the district attorney, John Stapleton, wherein, in his address to the jury, he said:

"Again, Gentlemen of the Jury, according to his own testimony, lying in wait to kill this young man, a clean, Christian, upright young man, gentlemen, from the evidence in this case."

Bill No. 4 complains of the argument of the Hon. Lloyd Croslin wherein he is shown to have said:

"Now, let's see what the other witnesses said about how much he knew. He walked across the street, after he had shot the man, with the shotgun in his hand, and told the boys in the Taxi Stand to call the Sheriff, that he had just shot a man. They said he was calm—the Colonel brought that out—that he behaved like an ordinary man; then asked for a cigarette. He paid the boy for the cigarettes. He talked to the Sheriff himself and told the Sheriff who he was, told the Sheriff what he had done.

He remembered everything except that part that counts, gentlemen. Now, where is there temporary insanity in those facts? Gentlemen, his story just doesn't hold water. Fred Jones stands here before this jury with a story that is fabricated. Yes, Fred, you are hiding behind a petticoat of your wife, but it isn't low down enough because they can see you under it, and, as low down as she has made herself by the testimony which she has presented in your behalf, she in my estimation would have to look down into the depth of a dark cavern to reach you to the depths that you have sunk in letting her make such testimony."

This bill also contains the further statement:

"Unless said statement, 'Fred Jones stands here before this jury with a story that is fabricated', was a fair and logical deduction from the evidence, then there was no evidence to show that said defendant's story was fabricated."

It is also worthy of note that the trial court's qualification to such bill contains the statement that in his opinion such a conclusion relative to such story was such a one which the district attorney had a right to deduce from the evidence. Appellant's own wife testified that she became frightened because she thought she saw appellant peering at her and Love through the glass of the store, and appellant testified to practically the same thing.

Bill No. 5 is a complaint regarding the argument of the district attorney of Floyd County regarding the duty which the jury owed to the county in which this cause was tried, as well as the people of Floyd County and those of West Texas, to impose upon this appellant a penalty which would cause him to pay the price provided by law.

Bill No. 6 complains because of a certain argument made by the Hon. Meade Griffin, special prosecutor, wherein he called the attention of the jury to the attitude of the appellant while on the stand in his own behalf, who evidently shed some tears in his direct examination and to his failure to shed tears while undergoing the cross-examination. The portion objected to seems to be the following:

"When I got him (referring to the defendant W. Fred Jones) on cross examination about it, he don't shed a tear (referring to the defendant's testimony about what he had seen his wife do the night of the homicide with the deceased). That was not part of the act. They had to put that in. Tears were just to be

shed on direct examination and he shed them, and he doesn't shed them on cross examination."

Evidently the tears were shed and again withheld, and were a subject of comment upon by the attorney. The phrase, "that was not part of the act; they had to put that in" could have referred to the defense testimony of appellant and his wife, and it is worthy of note that the state attacked such defense and claimed that the same was untrue. The word "they" did not necessarily refer to appellant's attorneys; and while there seems to be no testimony relative to the tears, if such did not happen in the presence of the jury, it is not shown in the bill, although it is shown in the bill that there was no testimony relative thereto.

Bill No. 7 relates to the argument of a state's attorney relative to the truth of the testimony of appellant's wife as to the lascivious conduct claimed by her to have been engaged in with the deceased prior to the time he was shot by appellant. It was the theory of the state that such testimony was untrue, and an argument relative to its truth should have been allowed, since if the jury had so believed, or if it had created in their minds a reasonable doubt thereof, the punishment meted out to appellant should have been a different one under the law than the one he received.

Bill No. 8 taken to the closing portion of the argument of the Hon. Meade Griffin presents no error, in our opinion, and will not be further discussed.

Bill No. 9 presents a peculiar question, one having seldom occurred as shown by the court reports. After the testimony had all been taken and the trial court had prepared and read his charge to the jury and the attorneys had addressed the jury, which had then retired and elected one of their number as foreman, they were taken from the court house to their evening meal, at which time they handed the judge the copy of his charge, as well as certain blank forms of verdict, in addition to purported blank ballots; whereupon the judge handed these papers in a sealed envelope to the district clerk, who locked them up in a cabinet. Upon the return of the jury for deliberation, they did not have with them in their room the envelope containing the judge's charge. After some hours of deliberation they notified the court that they had reached a verdict and asked for some paper or the forms for the verdict in order that such verdict could be written. Upon investigation, the envelope

containing the court's charge and blank forms for verdict was found locked up in the district clerk's office and such was then conveyed to the jury in their room. They remained therein for some thirty minutes and finally returned into open court their verdict of death. Upon being polled, they answered that such was their verdict. It is shown by proper bill that the court, in open court, read his charge in full to the jury and that at least two of the attorneys, in their argument, read some of it with the exception of the precautionary measures therein, and that in all probability the jury did not read the charge when it was belatedly handed to them.

The statute, Art. 660, C. C. P., provides that when finally prepared, the judge shall read his charge to the jury; and Art. 665, C. C. P., provides that "The jury may take to their jury room the charges given by the court after the same have been filed. They shall not be permitted to take with them any charge or part thereof which the court has refused to give."

It will be noted that the word "may" is used and not the word "shall". This statute has been carried through all revisions in our code in the same language, it being O. C. 601, R. S., 1895, Art. 722, C. C. P., and up to the present Art. 665, C. C. P. We do not think that under such article the jury was required to have such charge in their physical possession all during their deliberations. If so, the question would naturally arise, who should keep the same, and further, should each juror separately read the same or should the foreman only read such out loud to the other jurors? We think the statute was complied with by the reading of the same to the jury by the judge and then leaving to the discretion of the jury whether they should take such with them to their deliberations should they so desire.

We are furnished with an opinion fairly in point herein where the jury failed to take with them into their retirement a special charge read to them by the trial court. In Thomason v. State, 71 Tex. Cr. R. 439, 160 S. W. 359, this court merely said:

"By the approval of the charge by the court and giving and reading it to the jury, the appellant got the full benefit thereof."

Bill No. 12 complains of the fact that after appellant's wife had testified, among other things, that he became drunk and passed out and that she and the deceased took him out of the car and into his store and laid him down on the floor, that she and the deceased then went back into the car and fondled each other and engaged in lascivious conduct, she thought she saw

her husband peering through the glass from inside the store, and that she and deceased then drove away in the car out to the public school grounds and into a secluded spot where there was "an L-shape opening behind the building", where they stayed for about thirty minutes and then returned to the store, and soon thereafter the shooting took place. Upon cross-examination, she was asked if upon a previous trial hereof she had testified that while the witness and the deceased were parked out at the high school, if she did not say that they had an act of intercourse upon the ground near the car, to which question the witness answered "Yes", and that at such time she was the mother of a baby about sixty days old on that date. The witness' testimony in the present case, on direct examination, was that she had "an affair" with the deceased, and they were frightened and had agreed to say nothing about it, and some of her later statements were predicated upon such agreement. We think this testimony was admissible on two grounds: Art. 728, C. C. P., would allow all the transaction complained of where a part of same had been gone into; and again, we think the state had the right to go into the "affair" between appellant's wife and the deceased, it being the basis of appellant's plea of not guilty herein. That the state had the right of cross-examination of this witness is plain, not only as to her present testimony but also as to any testimony given by her in a former trial. We have so held in Rylee v. State, 135 Tex. Cr. R. 87, 117 S. W. (2d) 85, in a quotation from Brown v. State, 61 Tex. Cr. R. 334, 136 S. W. 265, 266, as follows:

"A wife called to testify in behalf of her husband is subject to cross-examination like any other witness, limited only that the cross-examination must be confined to the matters testified to by her in direct examination. Johnson v. State, 28 Tex. App. 17, 11 S. W. 667; Jones v. State, 38 Tex. Cr. R. 87, 40 S. W. 807, 41 S. W. 638, 70 Am. St. Rep. 719; Merritt v. State 39 Tex. Cr. R. 70, 45 S. W. 21. And in Hampton v. State, 45 Tex. 154, it is held that, where the wife is called to testify in behalf of her husband, the prosecution has the right to cross-examine her touching her testimony on a former trial or examination of the same case."

Complaint is also made in Bill No. 17 because the state was allowed to show that immediately after the shooting and after Mrs. Jones and others had taken H. C. Love, Jr., to the hospital, that Mrs. Lattimore, the nurse, asked Mrs. Jones, "What is this, a car accident?" and Mrs. Jones said, "Yes". She had testified on direct examination that she and appellant's father caught the falling body of H. C. Love, Jr., and placed it in her automobile

and took it immediately to the hospital. This conversation with the nurse took place while the deceased, then living, was being placed on the operating table. This occurrence having been brought out by the appellant, we see no reason to forbid the state a cross-examination thereof. This testimony was limited in the trial court's charge for the purpose of the impeachment of Mrs. Thelma Jones, if it did so, and for no other purpose. We see no error therein.

Bill No. 16 relates to an objection to a showing by the state as to the relative size and strength of the appellant and the deceased. Surely, if the testimony had shown that appellant, rather than the deceased, was a much smaller man, such would doubtless have been admissible; then the facts being shown to be the opposite, we think the state had a right to let the jury know the size and condition of the deceased, such testimony coming from the appellant and therefore known to him.

In 22 Tex. Jur. p. 698, sec. 162, it is said:

"But where the homicide was committed with a firearm, this character of evidence usually throws no light on the transaction; in so far as it is germane, however, it may be received," citing Lundy v. State, 59 Tex. Cr. R. 131, 127 S. W. 1032.

In the same volume, p. 658, sec. 144, it is said:

"Receipt of such testimony, however, will not warrant a reversal unless it be shown that the defendant was prejudiced thereby."

Bill No. 17 has already been adverted to and we see no error reflected therein.

Many of the bills evidenced by small numbers relate to certain arguments made to the jury by the attorneys representing the state herein, all of which seem to be based upon the facts proven and the state's theory predicated thereon. True it is that the arguments thus complained of evidence great zeal, and an evident belief therefrom might be detected that such attorneys were convinced not only of the appellant's guilt in the charged homicide but also in the fabrication of his defense, not only by appellant but also by his wife. Again, such an attack, if it destroyed the defense of the accused person, also might leave the state with an unexplained killing, and thereupon, again, finds the state with the duty of showing malice in this deliberate act resulting in the death of H. C. Love, Jr. While we have

no degrees or differences in malice at this time, malice may be shown by the acts of an accused by his actions at the time, prior thereto, or immediately subsequent to the act complained of. The state vigorously attempted to show the falsity of the appellant's defense and attacked the same as untrue. It evidently convinced the jury of its falsity and also of the maliciousness of the act of killing. Therefore, we do not feel inclined to say that there was not shown by appellant's cool and unexcited acts and his claimed spying on his wife and Love and his eventual shot, that such acts excluded the possibility of the formation of any malice. Malice can be engendered in one's mind in but a moment and demands no certain passage of time before same can become a portion of any offense.

An argument objected to, among others, was one in which one of the state's attorneys referred to the deceased as "a clean, Christian young man." We think this argument was justified by the evidence given by the deceased's mother who testified to a dying declaration as follows:

"When I went into my son's room, the first thing I said, I says, 'Son, look to the Lord. He is the only one that can help you now.' And he says, 'I know it, Mom, I will.' He wanted me to pray for him then. He prayed and prayed a little while and when he quit, when he stopped, he said, 'Mom, I am ready to go,' and then in a few minutes he said, 'I don't see why Fred would want to shoot me, there wasn't anybody mad.'"

Again, complaint is made of certain remarks relative to the testimony of the appellant's wife, Mrs. Thelma Jones, which could not, to say the least, be called complimentary. In the light of the testimony adduced by the state relative to her actions in these matters, not only from her but also from other witnesses, we think the remarks were a fair comment on the record.

Objection was made and exceptions reserved to certain comments by the state's attorneys on the testimony of appellant relative to his lying in wait and to his version of the facts surrounding this tragedy. Unbelief thereof was expressed in such argument and evidently based upon the testimony of seven witnesses from appellant's home in Floyd County who seemed to be unanimous in their testimony that appellant's reputation for truth and veracity was bad and was of such a nature as not to entitle him to be believed under oath. We are of the opinion that this matter was arguable before the jury.

We also think that the claimed different statements made by

appellant's wife were subject to the strictures leveled thereat by the state's attorneys.

Again, complaint is made because the testimony offered by the state shows no motive for this homicide. Motive, while useful, is not necessarily to be shown in estimating an offense such as the one under investigation. See 12 Tex. Jur. p. 254, sec. 32.

The trial court's charge is attacked in many phases thereof, among such being the portion relative to the burden of proof concerning the insanity of appellant at the time of the commission of the offense, and thereunder we are cited to the opinion in the case of King v. State, 9 Tex. App. 515, wherein Judge Hurt, writing for himself only, held in effect that the state would have to show the sanity of appellant beyond a reasonable doubt, and that such sanity question is not governed by the rule of the preponderance of the testimony. This statement in the King case, supra, only expressed the views of Judge Hurt, and Judges White and Winkler, a majority of the court, refused to accede to such a view as expressed by Judge Hurt therein; and in Webb v. State, 9 Tex. App. 490, affirmed the doctrine that the establishment of one's insanity is governed by the law of the preponderance of the testimony; and again, upon a retrial of the King case, supra, (reported in 13 Tex. App. 277), it was again made plain that the state was not under the duty of proving the sanity of one accused of crime beyond a reasonable doubt, but only by the preponderance of the testimony. We think such is the law at the present time. See 18 Tex. Jur. p. 28, sec. 15.

While this verdict is a severe one and the trial evidences a vigorous prosecution, as well as a learned defense, we cannot say that we find any errors herein that might have affected the verdict; and while this is looked upon by the state as an unexplained killing, the nature of the defense failed to give to the jury any doubt based upon reason as the cause thereof. That appellant could act upon malice seems to be plain under the law, and we do not feel inclined, under the sordid facts here presented, to say that such was not present. That the defense was not believed is but a matter that is usually found in sharply contested matters such as this, and often the strength of the verdict is found in the attempted defense which the jury has discarded. The punishment here accorded appellant is provided by law, and it is beyond our power to say that, although within the statute, the same was too severe.

We find no error shown in this record, and the judgment will accordingly be affirmed.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

In a very forcible motion for rehearing appellant urges that the matter complained of in Bill of Exceptions No. 16 was an error which calls for a reversal of the judgment. The motion is predicated on the proposition that the bill reflects that the cross-examination of appellant by the state over objection proved not only the disparity in the comparative size and strength of appellant and deceased, but also proved that the latter was weak and sickly. Of course, appellant was before the jury and they could appraise his physical condition from his appearance, but we observe from the statement of facts that without objection the state elicited from appellant on cross-examination that he was six feet tall, weighed about 175 pounds and was in "perfect physical condition." The trial court directed the bill to be in question and answer form, but when analyzed it shows that in connection with appellant's evidence on cross-examination of his own physical condition, he further testified in substance, over objection, that he knew as a fact that H. C. Love wasn't over five feet, seven inches high; that he did not know what Love weighed, but imagined 130 pounds was about right; that he did not know that Love was a sickly kind of fellow; that he did testify that Love had quit working in the store for awhile, voluntarily, and went out and worked in the harvest field with a combine; that he did not know that Love had to quit his job of working with that combine before the season was over because he wasn't physically able to stand the work involved. We call attention to this because to our minds the bill in question only presents objection to evidence as to the comparative size and weight of appellant and the deceased.

Appellant particularly challenges the following general statement found in our original opinion in discussing Bill of Exceptions No. 16, "Surely, if the testimony had shown that appellant, rather than the deceased, was a much smaller man, such would doubtless have been admissible; then the facts being shown to be the opposite, we think the state had a right to let the jury know the size and condition of the deceased, such testimony coming from the appellant and therefore known to him." We think the language employed was too broad, and perhaps leaves the impression that such evidence would be material regardless of whether the issue of self-defense was in the case. If

a general statement as to the law should be employed, which is always of doubtful propriety, we think it would be more correct to say that where a homicide is committed with firearms, or other deadly weapon, and no issue of self-defense is in the case, evidence of the relative size and strength of accused and deceased would, *ordinarily,* be immaterial, but in so far as it might be germane to some issue in the case it would be receivable in evidence. The cases specially relied on by appellant have been again reviewed. They are Hickman v. State, 93 Tex. Cr. R. 407, 247 S. W. 518; Watson v. State, 123 Tex. Cr. R. 360, 59 S. W. (2d) 126; Watson v. State, 120 Tex. Cr. R. 482, 48 S. W. (2d) 623; Burton v. State, 77 Tex. Cr. R. 314, 178 S. W. 334; Taylor v. State, 41 Tex. Cr. R. 148, 51 S. W. 1106. These cases support appellant's proposition that where the killing occurs with a firearm, and the issue of self-defense is not raised, evidence of disparity in the size and strength of accused and deceased is ordinarily immaterial. Such appears to be the holding whether the evidence was offered by accused and excluded on objection from the state, or offered by the state and admitted over objection from accused. However, none of the cases were reversed because of the admission or exclusion of such evidence, and about as far as any of them go was to say that the evidence seemed to be immaterial, and in the event of another trial should not be admitted.

It would be ill-advised and unsound to say that in no case where the killing was committed with firearms, and the issue of self-defense was not raised, that evidence of disparity in the size and strength of accused and deceased would be admissible because that must of necessity depend on the facts of the particular case. We are inclined to the view that the case now before us furnishes an illustration of where such evidence was admissible. It appears in said Bill of Exceptions No. 16 that when appellant was asked on cross-examination by the state as to the size of deceased, and appellant objected, the trial judge said, "In view of the turn of this case at this time, I overrule the objection." We find no explanation of what "turn" of the case was in the court's mind, but evidently the development of the case had been such that he deemed the evidence receivable. The case had so developed that the state was contending that the testimony of appellant and his wife as to the claimed misconduct of deceased with the wife was fabricated, and there can be no dispute but that such issue was raised. It will be recalled that appellant had testified that while he and Dillard were in the back seat of the car after they left the cafe, appellant, while feigning sleep or unconsciousness, witnessed his wife and de-

ceased, who were on the front seat, hugging, fondling and kissing each other. The natural reaction of the husband would be to violently resent such conduct toward his wife instantly, unless deterred therefrom by the superior strength of the one guilty of such conduct. There was no such reaction on the part of appellant. There being no such restraining influence present in the instant case, it occurs to us that evidence of such fact, that is, inferiority in size and strength of deceased to that of appellant, was proper to go to the jury on the issue of whether such conduct occurred as claimed by appellant and his wife, or whether their evidence regarding it was fabricated.

Appellant complains seriously because in dealing with his Bill of Exceptions No. 5, which was directed at the argument of District Attorney Croslin, we made no specific holding regarding same. The argument complained of was as follows:

"Now, gentlemen, you have a serious responsibility in a case of this kind. We all do. I know that we in representing the State have a serious responsibility. You have a duty to perform to Crosby County and under the circumstances in this case to Floyd County and the people of West Texas to impose upon this man a penalty that will say to him, 'Fred Jones, when you have committed the offense of murder, you are going to pay the price provided by the law.' "

Appellant lays much stress upon the fact that the court certified in the bill that no evidence was introduced showing that the jury had any duty to perform to Crosby or Floyd County, or to West Texas. From this it is argued that the district attorney was declaring to the jury new facts not in evidence. We do not think the argument subject to such contention. The law laid upon the jury the duty to reach such a verdict as was demanded by the evidence, and this we construe to have been the effect of the argument. See McKenzie v. State, 116 Tex. Cr. R. 395, 11 S. W. (2d) 172, at p. 179; Maddox v. State, 138 Tex. Cr. R. 210, 133 S. W. (2d) 977; Cloud v. State, 150 Tex. Cr. R. 458, 202 S. W. (2d) 846. We do not review the cases relied upon by appellant. Some are distinguishable, and in others the argument was held reversible because the jury were told what verdict the "citizens" or the "people" expected from the jury.

All other matters urged in the motion for rehearing have been considered, and the question again reviewed. Believing they were properly disposed of in our original opinion, they will not be written upon further.

The motion for rehearing is overruled.